Court, the second time in an appeal relating to the Just Compensation Award for the government's taking of an easement for ingress and egress, the installation and operation of seismic sensors on a parcel of property, 897 acres in San Diego. In the first appeal, the court had awarded $3 million as just compensation. The government appealed to this court, and the court reversed on the ground that the rule for compensation should be that for a permanent rather than a temporary easement. Unfortunately, on remand, the trial court, in making its award of just compensation applying the permanent taking standard, fell short of the constitutional minimum in two respects. First, the court failed to provide interest from the date of taking as required by blackletter law in the Fifth Amendment. Second, the trial court failed to provide any compensation at all for the easement over 279 acres of prime industrial and commercial property with a permanent easement. And it is for those two errors that we ask the court reverse. Do I remember correctly that as to the developable land, a word that I find hard to pronounce, so I keep calling it the D land and then the U land for the one that's undevelopable, but as the D land, that you presented evidence that there was some risk of being denied the permission to develop, extra costs of getting permission, and delay in permission, and that all of those together had some positive effect in diminishing the value. Is that correct? Absolutely, Your Honor. That is the testimony. We presented the testimony of Cynthia Eltred, who is a well-known land use attorney in San Diego, who had worked on this and other properties adjacent to it, owned by these owners, and she testified to the whole process that when a third party, such as the government, owns an interest in the land, the county will take into account that interest, will request the views of that party, and you simply have to say that county employees keep timesheets, just like the lawyers do, and that the developer is required to pay for every hour of time spent by a county employee dealing with an issue. So even if we ultimately did get approval or got approval for, say, a modified development to take into account the concerns of the easement holders, that that would be a major expense. And for that reason, Your Honor, the testimony of our appraiser, Randy Tagg, was that given two identical parcels, one encumbered with this easement and one not encumbered with this easement, that a developer would obviously choose the one that is not encumbered so that he or she doesn't have to deal with the problem. Now the government also had testimony to the opposite effect, right? That at most there would be an advisory note that there wouldn't affect approval of developing the land, and that the government would redeploy the censors somewhere so it wouldn't affect any development. Yes, Your Honor. The government did produce a witness. The evidence you refer to, however, was pretty thin. It's a man named Schick, and he was produced pursuant to a subpoena to the county. Schick is a project manager for grading permits only. He's not in charge of development approvals. He only deals with grading permits, which is sort of one stage in the development process. What Mr. Schick testified to was that he could not testify on behalf of the county whether they would approve a grading permit or not. He did admit that they would notify the easement holders, and of course the county is concerned that if several people have property interests in this land, one of them can't come in and request a land use approval or a permit for construction that is going to impair the property interests of the others. Did Mr. Schick testify not only about his view that approval would be forthcoming, but to the two, what I view as distinct questions, that it might take longer and that it might be more costly to obtain because of the additional complexity? He didn't testify per se, to my recollection, Your Honor, on those two issues. Either way, he certainly didn't say it wouldn't take longer and it wouldn't cost more. He doesn't really know about the cost from the point of view of the developer because all he does is look at engineering plans and see if they comply with the requirements of county regulations and so forth. But what he did admit to is, first of all, that he couldn't speak on behalf of the county, couldn't guarantee that this permit would issue, and second, the one thing that he did say is even talking about this advisory note business, this is a note that is directed toward the owner of the easement, a note that would be unnecessary if there were no owner of the easement. The other critical thing that Mr. Schick testified to, Your Honor, is that if two owners of interest in the land disagree, the county kind of stands back and says, you guys work it out. I'm not proving anything until the parties are able to resolve their differences. So the government has a seat at the table now in the development of this property. For the trial court then to conclude, as he did, that that property interest, that seat at the table, that infringement upon the freedom of the owner to develop his property has no value at all, is unsupported by the record as a whole, and that's what damages determinations are supposed to do. It's supposed to take into account the record as a whole. The trial court also cited, I might add, the testimony of Mr. Roach, but he's an appraiser. He wasn't qualified as an expert in property development in San Diego County, nor for that matter was Mr. Schick testified as an expert in development, but only in his little part of the process, this rating permit that you get sort of toward the beginning of the process, as opposed to the fact that both Cynthia Eldred, the land use attorney, qualified as an expert in land use approvals in San Diego, and David Wick, the property manager, who testified himself that he had been through a number of these processes and that it was indeed much more complicated, much more expensive to deal with easement owners, easements that he himself had been involved in negotiating and selling for many, many thousands of dollars per acre. Can you remind me, as to the developable land, is this easement essentially terminable in the sense that you do have the right to say, you can put your boxes elsewhere, but you have to remove them from these 200 and whatever it is acres? It does not read as the court has indicated. Mind you, this is an admission of liability, a unilateral concession of liability that the government filed two months before trial. So the government drafted the terms of that easement. What the provision actually says is once a grading permit is issued, so it doesn't help you until you get the permit, and that's the first big problem. But when the permit is being applied for and the relevant local or state officials are looking at it, do you get to represent to them, yes, there is this easement and there is 14 boxes, maybe they're all on the 278 acres, I don't know. But actually under the terms of the easement, we can require the government to remove all of them from these 278 acres so that on a going forward basis, they're not on these acres. It does not say that, no, Your Honor. The provision actually allows the landowner to notify the government, we've now got a get their censors out of the way. It does say the easement shall terminate, but what exactly does that mean? Because it's a blanket easement with a right of the government to redeploy anywhere else on the 297 acres. In short, it's a little bit like that game of whack-a-mole where you move the easement, you bang it at one place and it pops up somewhere else. In addition, of course, the landowner doesn't know whether there are censors on this parcel of property or not because it's all secret, it's all concealed. So the provision, although the government points to it… I'm sorry, you don't know which, if any, of the 14 censors are on this particular section of the land? We know they're somewhere on the 897 acres, Your Honor. In fact, the testimony at the last trial was that… So there could be zero, or there could be all 14. That's exactly right. And that's why the number is not so important, Your Honor. There's been this quibble about whether it's 14 or more than 14. But as long as you don't know, what we're valuing here is the easement as described by the government. And what the government says is, we can put them all any place we want, and you can't stop us from doing that. That's the nature of an easement. So that termination language, I think, is problematic, and I think it derives from the government's original position that they had taken an easement over 14 square foot areas and that the easement was mobile, that it would move whenever they moved the censors. The court has rejected that argument, but that's where the language came from back when the government took that position. The chart that's 1793 of the joint appendix, which was part of the stipulation, shows each parcel having at least one or two censors on. What you're saying is that is no longer operative? In other words, there have been changes since that stipulation? For example, parcel 10, as I understand it, is the developable property. Is that correct? Yes. And that shows two censors on there placed in September of 2004. Are you saying those are no longer there, or we don't know? We don't know, Your Honor. And that's why the government took this easement over the entirety of the 897 acres, presumably, so that we wouldn't know where they are. The government doesn't want illegal immigrants to know where the censors are, and they want the freedom to move them around wherever they feel they're necessary. So what I did say is that there was testimony that three of those censors had been removed, permanently removed. We don't know which three. We don't know what has been done with them. So you don't know whether they've been removed from the developable land or the mitigation land? That's correct, Your Honor. We do not know. So if I may, maybe I'd like to touch on the interest question, or perhaps I don't need to touch on it that much because it's such black-letter law. You're into your rebuttal. Why don't you save the remaining time of your rebuttal, and we'll restore it back up to three minutes. Thank you, Your Honor. Mr. Arbat. May it please the Court, John Arbat for the United States. I'd like to begin with this Court's opinion in the prior appeal, and I feel obliged to do that because Judge Shaw is here, who wrote the opinion. Don't feel obliged on that account. I think it's a very important point. You're welcome to do what you want, but don't feel obliged for that reason. It's important to remember what the Court ruled in the last appeal, which was that the $3 million original award was vacated and sent back for a redetermination of just compensation for, quote, exactly what we have identified as having been taken in this case, unquote, which is, quote, a minimally invasive permanent easement to use undeveloped land that is unilaterally terminable by Otay Mesa, unquote, and under which, quote, each censor must be located so as not to affect the functionality of the property. That is what this Court decided in the last appeal. Now, as cross-appellant, I'd like to start with the government's affirmative arguments, which is that we believe that the $455,000 judgment as to the mitigation land should be reversed, and actually there are two grounds on which we propose that. Couldn't we start with, I mean, correct me if I'm wrong, but I think in the original opinion we sort of said this is a unique situation. On remand, the Court of Federal Claims can use its judgment in fashioning the appropriate damages approach. That says to me, unless I'm misremembering it, that, you know, we sort of said, okay, you have some leeway here. And it looks to me like what the judge did on remand, Judge Wheeler, would say, look, this is a very unique case. I have these two conflicting pieces of testimony. One said there was a 40% diminution in value. Another said 0%. And I'm talking here about the mitigation land, of course. And he basically, as I read it, sort of came to a jury verdict. He said they're entitled to something. This seems like a fair, reasonable amount. Without saying whether that's right or wrong, do you see the judges proceeding that way and sort of following a jury verdict approach? Your Honor, I think in a very general sense. But I think that the problem with the judge's approach is one of the grounds on which we think the award should be reversed, which is that there simply is not any evidence to support the premises of the award. A, which is that this minimally invasive easement created a risk that the permitting authorities in California would not approve the mitigation acreage for use as mitigation land. Why isn't that sort of a logical conclusion? I mean, they're there and it's something that makes the land, although perhaps minimally less attractive, nevertheless somewhat less attractive. Your Honor, in principle I suppose that could be, but the focus of our cross-appeal is that the evidentiary record simply does not support either the notion of such a risk or, perhaps even more importantly, the notion that any arguable risk of that nature is reasonably quantified as 5% of the fee value of the mitigation land. And I'd be happy to go through the reasons why the government believes the factual record does not. Can you address what I spoke about a couple of times with Mr. Arzula? It seems to me there is a question about risk of ultimate denial of use of the undeveloped land as mitigation. There is a question of, there are two questions related to the complexity. One is complexity breeds costs and complexity breeds delay. Costs and delay are themselves losses. Why aren't those added into the basis for the award for possible mitigation land? Well, Your Honor, because those sorts of costs that Mr. Marzullo was referring to have to do with the industrial development land. And that is the part of the Court's decision that we believe is correct. There would be no extra costs from the complexity? I thought that the problem here was that just as to the undevelopable land, the question was, will there be an available use of that as mitigation land? And the answer is, well, it looks like there probably will. Maybe there is a small chance that it won't. But in getting to that place, the presence of these devices, movable devices, will itself generate delay and transaction costs, even if we assume that ultimately the relevant government authorities will say yes. Well, Your Honor, I think that testimony went to the industrial development land. But to the extent that it went to the mitigation property, there is a common sort of universal problem with that kind of testimony. Mr. Marzullo mentioned the testimony for Andy Tagg, the plaintiff's appraiser. He also mentioned Cynthia Eldred. There were actually two other witnesses that testified for the plaintiff. Sean Dyer and Jim Carter. This is all addressed in our briefs. But the universal problem with all of their testimony was that they were not evaluating the stipulated easement. So they overshot the mark in terms of quantity. But as a qualitative point, how can it possibly be that there aren't positive, maybe not very great, but positive extra costs, transaction costs, in trying to get the approvals when there's this additional property rights owner and qualitatively the real possibility of delay in getting the approval. Delay is money, right? So are transaction costs. That's also money. Two things. I don't think you can take sort of a qualitative approach to that because the proponents of that testimony were all talking about, A, an easement that allowed for an unlimited number of censors to be placed on the property, not just 14. And Judge Wheeler found this in his opinion. Or, B, they were looking at an easement that allowed all sorts of other activities on the property other than what is stated in the stipulation. For example, Elder testified about, in her view, that the stipulated easement allows agencies, public and private entities, to have access to the subject property. Or Carter said that he read the stipulation as permitting other Border Patrol activities beyond just placing and routine maintenance of these censors. And Judge Wheeler found that this testimony was minimally persuasive. He essentially rejected this testimony, yet this is the kind of testimony that the plaintiff is now relying on, on appeal, to show a clear factual error. The plaintiff agrees that this part of its appeal has to do with, the plaintiff has to show clear factual error. It's this sort of testimony that the trial judge rejected. But by the same token, the question as to your cross-appeal of upholding the $450,000 award, you have to show no substantial basis in the evidence under a clear error standard, right? Yes, there's the clear error standard. Right, and the trial judge doesn't in fact have to recite all of the evidence that Otay can rely on to show that that amount is not clear error. So why isn't the testimony that was given in terms of an over-reading of the easement, nevertheless real positive support for the qualitative point, that complexity would generate additional costs, both transaction costs and delay costs, as well as a risk of not getting the approval? Well, as to the industrial development land, Your Honor, the judge rejected the inferences, rejected the testimony. And you're saying there was no such testimony as to the other land, the land that… Mitigation land. The potential mitigation land. Yes. And it's not mitigation land until it's approved for mitigation, right? That's right. So it's undevelopable land until it becomes mitigation land. That's right. Well, in addition to the point I just made about the plaintiff's affirmative testimony not supporting its position on that, all of the other testimony, mainly from the government's witnesses, but even from one of the plaintiff's own experts, corroborated the government's view. For example, I mean, this is all laid out in the briefs. One of the best examples, I think, is the testimony of Susan Wynn, the Fish and Wildlife Service biologist. And Judge Wheeler discussed this testimony in his opinion. Her testimony was that the impacts of the censors are negligible, that they are not measurable, and that the rights granted under the easement would not have any effect on Fish and Wildlife Service affecting the properties for mitigation purposes. So there's one agency down. Is that the only agency that would have to approve the mitigation? The second agency is the California Department of Fish and Game. She couldn't speak for them, right? No, but the government put on experts or witnesses from the state agency. That said, we can assure every possible buyer of the mitigation rights that this will simply be no problem. That was the testimony of the- Really? That absolute? Yes. Yes, Your Honor. David Lawhead, the state agency scientist, his testimony, which was discussed by Judge Wheeler at Joint Appendix 7, quote, the direct placement of the censors and the occasional maintenance would have a negligible effect on biological resources and would not cause a deduction of any mitigation credits. Planet's own expert, Mr. Novick, who's identified as a government expert in Planet's Briefs, but who's actually an Otay Mesa expert, she, as we point out, ground truth this government testimony. Again, his testimony was between 2000 and 2008, Novick had spent hundreds of hours doing field work on the subject parcels. That is, quote, getting out of the truck, looking around at whatever we're surveying, either habitat or sensitive species, unquote, yet he had never noticed, quote, any impact that a border patrol censor might have on the biology of the subject property. And that's at Joint Appendix 2067. There's more. There's another California Department of Fish and Game witness who testified for the government, Michael McCollum, also discussed by Judge Wheeler at Joint Appendix 7. His testimony was, quote, the easement and activities conducted under it would have a negligible effect on the environmental resources of the property as well as on the agency's, meaning California Department of Fish and Game, agency's decision to use the property for mitigation, unquote. Discussing, the judge there was discussing testimony at Joint Appendix 2114 through 16. There's also the testimony that, or the findings that Judge Wheeler made in his first just compensation decision, the 2010 decision regarding a place called O'Neill Canyon where the judge found that plaintiffs set up a mitigation bank in O'Neill Canyon, quote, another property owned by plaintiffs north of Parcel 11 where the government admits to placing at least two censors between 1992 and the present, unquote. And then the judge went on to find, but, quote, despite border patrol activity in this area, plaintiffs sold all the mitigation credits available in O'Neill Canyon, unquote. That's at 93 federal claims at 484. The judge in his first damages decision made a similar point about Parcel 3, which is one of the parcels at issue here. The judge found that Fish and Wildlife Service and the California Department of Fish and Game accepted 120 acres on Parcel 3 as mitigation land and that plaintiffs sold 15 acres of mitigation credits from the 120 acres, despite border patrol censors and activity in that area. So when you take... Our clear error point is that, admittedly, it's a deferential standard, but the court can be, and in this case should be, left with a definite and firm conviction that a mistake has been made. When you put all of that evidence that I just recited together with the fundamental problem with all of the witnesses who testified on behalf of the plaintiff, which is that they were assessing something much broader, something much more invasive than the minimally invasive easement that's set forth in the government stipulation. So under the U.S. Gibson test, the court can find that there is some evidence to support this award, but on balance, on the entire record, for the reasons I've just gone through, it can still say, we realize there is some evidence, but looking at the entire record, we think that a definite mistake was made by the trial judge and we believe that is the situation here and that the $455,000 judgment should be reversed. But before I run out of time, I've been talking about factual grounds. I mentioned at the outset that I think there's a second ground that the court may want to take a look at, and that is a more legal ground, which is suggested, or to my mind, conceded by the plaintiff in its reply brief on page 28. And I'm quoting, Otay Mesa cannot recover other consequential damages in this takings case, such as compensation for revealed sensor installation or for a risk of non-approval for mitigation. Where's this? This is at the plaintiff's reply brief, page 28. So that would be the yellow brief. To me, that reads like, essentially as a concession, that this award has a legal flaw in it, that this kind of risk-based damages, in the plaintiff's own view, is beyond the purview of a trial court to award. So I just put that out there for the court's consideration. It came up, as I say, in the reply brief. The risk of disapproval of extra costs and the delay, surely, at least as a qualitative matter, can translate into a lower price that some purchaser would pay for it, wouldn't it not? Your Honor, I suppose in... Because they're going to have to spend that money. Spend the money to get the later approval. Well, let's look at the mitigation plan. The testimony I just discussed indicates that there will be no impact on the ability of plaintiffs to get approval of its mitigation plan for use for mitigation purposes. As to the industrial development plan, as the Court pointed out in its previous opinion, this is a unilaterally terminable by Otay Maysay easement, so that as soon as it gets a grading permit, it notifies the Border Patrol. The Border Patrol comes out and removes or redeploys the censor. And the testimony... I've talked about this a little bit with Mr. Marzulla. Do they have the right to insist on removal from the 278 acres of all the censors so that the land to be developed would assuredly no longer have the government easement on it? Yeah, they have the right. If they want to develop... I think that's a yes or no question. At least, am I wrong about that? Your Honor, the answer would be yes. If they want to develop the entire Parcel 1, let's say, which I think is 90 acres, if they want to develop the entire... Let's take Parcel 1. Let's say it's all developable land. If the plaintiffs want to develop anywhere on that parcel, the government has to remove the censor under the stipulated easement. I'm just trying to say, can the Kenote request that censors be removed from the entire 278 acres? And the government will have to do that? As soon as it wants to develop on the 278 acres. And they will be removed from the 278 acres? They could be redeployed, but these... But redeployed within the 278 or somewhere else?  The testimony, the judge's findings, I believe, in the first decision was that the Border Patrol doesn't put these censors in developed areas or areas that are going to be developed. That's not where people try to cross. Just to drill down, if they're developing only, say, the back half of this development land, and that's where the censors are, and they request that the censors be removed from the entire acreage of that plot of land, would the government say yes, or would the government say, no, you're not developing, at the moment, the front half of this plot of land, so we'll just stick them over there? Which outcome is going to happen? As I read this, the stipulation, the obligation to terminate or to remove the censors is upon the plaintiffs obtaining a grading permit from San Diego County. So that's what triggers the government's obligation to come out and remove the censors. But as a practical matter, if the Border Patrol knows that the front half has a grading permit, the back half is going to be developed soon, this makes the entire area unsuitable for the use of censors, because any kind of earth-moving activity, whatever, can wreck, can destroy the censor. It's not very, very far underground, and they're delicate machines, apparently, and they're rather costly. So the Border Patrol would have no reason to say, okay, we'll take them out of the back half, but we're going to move them to the front half because your bulldozers are far enough away or something. I guess maybe they could wait for the three years during which the completion of all of the earth-moving and construction is done, and then put them on the back half that is still kept as parkland, but as part of the developed piece. Well, Your Honor, as I was saying, as soon as a grading permit is issued, they have to come out. And as a practical matter... Right, the question is what they have to do when they come out, because you say remove or redeploy, and the problem is or redeploy is an extremely uncertain term. Well... Because it doesn't say where. That's true. I mean, because the Border Patrol doesn't want the location for obvious reasons. And you think a buyer might just say, oh, never mind. We don't want any discount for that because we don't know what the heck is going to happen. I suppose in theory, Your Honor, but the testimony shows that that is not the case. I mean, the best person... Judge Wheeler even found that. He found that the most relevant testimony at this point was from Mr. Schick, the plaintiff referred to earlier. He's in the best position to know. He's from that department of San Diego County that has to do with grading permits and so on. And he said this easement is not going to pose any problem for the development of the land. And Judge Wheeler also found that Mr. Tagg, Randy Tagg, the plaintiff's own appraiser, confirmed Schick's opinion on this point because Tagg's testimony was that the censored easements are not going to stand in the way of our plans for developing this property. Things such as the new border crossing and big commercial activity on some of the parcels. Tagg himself said the easement is not going to cause a problem to hold that up at all. I think we need to call a halt to this. Our request has gone well over. Thank you. Thank you. Thank you. Mr. Marzullo, we'll give you eight minutes. Thank you. Thank you, Your Honor. I'd be happy to address the questions the court may have. Going to the mitigation land, I think Your Honor was correct that essentially the same analysis applies. The record I think does not support the characterization that counsel gave it. The testimony was not that under no circumstances would there ever be any delay or any additional cost or any problem resulting from mitigation. Quite the contrary, Mr. Carter, who is a broker in mitigation land in California, has set up numerous mitigation projects and testified that one of the biggest problems is the so-called endowment. When you set these things up, you've got to put away enough money to maintain the mitigation property into perpetuity because that's what you're doing. You're preserving it for the future for the species that live on that land. And he said, well, it's one thing when you can fence it off and keep the public out and then you just have sort of general ordinary maintenance. It is another thing if you go to the authorities, state or federal, and say, well, I can't really fence it out because the Border Patrol has the right to come on 24 hours a day, any kind of vehicle, any time they want, move the sensors around. The sensors go off every day. Illegal immigrants are then responded to. The Border Patrol comes, intercepts them on the property and so forth and so on. What is the agency going to say about the amount of endowment you need to have in order to protect that land, to preserve it for perpetuity for the species that are on the property? That was Mr. Carter's testimony. And contrary to what counsel told you, if you look at Judge Wheeler's opinion with respect to mitigation land, what he said is, I find it slightly more likely than not that the plaintiff will get mitigation credit. We don't know if it will be full credit. Slightly more likely. And that's where this risk, but he said, but I find a risk. I can't discount the idea that there may be a risk. He did not say that, he found not credible anybody who said that there was a risk of non-approval. So that's the mitigation land. As to interest, I would be remiss if I didn't at least mention that, happy to respond to any questions. I refer the court to Kirby Forest Products and the whole line of cases. The government has not cited one single case that says that interest can commence on any date other than the date. One of the rules we do have around here is that rebuttal is for rebuttal and not for making arguments that the affilee didn't make. Understood. So we did not bring up the interest subject. Fine, Your Honor. I appreciate that. And I suppose, finally, as to the recitals of testimony and characterizations, I would once again, without trying to go through them one by one, Mr. Lawhead did not testify. And I think if the court references the joint appendix, the court will see. He never testified. Sure, under no circumstances would we ever possibly even think of denying or modifying the mitigation here. What he did, in fact, testify to is, first of all, he went back to the Justice Department lawyer and asked the same question we did. How many censors are allowed and where do you put them and so forth and so on? And second, he testified, well, before we proved anything, we'd want to sit down with the government and understand exactly what they're going to do with the season. Counsel quoted to the court, as he did in his brief, and I think we need to be very careful about this, what the government did here is they took these guys on a tour. They said, do you see any censors? See any problems here? Then they put them on the stand and said, did you see any problems from the placement of the censor? And the witness said, no, of course they didn't. Well, we're not valuing the placement of the censor now. The government defined the easement that it took. What we are valuing, what the court has to value, is the easement as defined in the unilateral stipulation of the government. And the government all along has tried to misdirect the court to saying, well, we're not really doing what we took. We don't really put censors on all the acres that we took. We don't really access the property 24-7. We don't really go on very often. The operation of the censors really doesn't involve intercepting that many illegal immigrants and so forth and so on. But the valuation in a condemnation case, be it direct or be it inverse condemnation, has to be of the rights that the government defined, said they took without talking to us, having concealed it for many years, and having popped this on the court and the plaintiffs two months before the trial after spending years of litigating and denying that they'd taken anything. With that, Your Honor, I'd be happy to answer any questions. Thank you. Thank you. The case is submitted.